# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:10cv415

| | |
|---|---|
| ROBIN VINESETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) MEMORANDUM |
| Vs. | ) OF DECISION |
| | ) |
| UNITED PARCEL SERVICE, INC. | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**THIS MATTER** having come before the court on Defendant United Parcel Service, Inc.'s Motion for Summary Judgment (#24), Plaintiff Robin Vinesett's Response in Opposition (#27), and Defendant's Reply (#31). Having carefully considered such motions, the memoranda of law, and evidentiary materials submitted, and having conducted a hearing on the motions, the court enters the following findings, conclusions, and Order granting the motion for the reasons provided.

## FINDINGS AND CONCLUSIONS

**I.     Nature of the Action**

Plaintiff brings this claim under the Age Discrimination Employment Act ("ADEA") based on alleged retaliation for engaging in protected activity. He contends that his employer, on two occasions, terminated his employment in retaliation for engaging in protected activity.

First, Plaintiff contends that he was fired because he reported that a supervisor had made an age-discriminatory statement about another employee at the time Plaintiff was under investigation for threatening the same supervisor at her home. Following a grievance of the termination and an arbitration determination under a Collective Bargaining Agreement

-1-

("CBA"), Plaintiff was ordered reinstated.

Second, after being reinstated, Plaintiff was again discharged during the same year. As to the second termination, Plaintiff contends that he was discharged in retaliation for filing a complaint with the Equal Employment Opportunity Commission ("EEOC") following his initial termination.

In response to such allegations, Defendant contends that it did not fire Plaintiff in retaliation for engaging in protected activity, but based on Plaintiff's verbal and physical outbursts at the workplace.

## II. Factual Background

Plaintiff worked for Defendant from 1977 until his final termination in 2008. #28, at 1. At the time of his discharge, Plaintiff was working as a "feeder driver" and drove tractor trailers between Defendant's package centers and hubs in Charlotte, North Carolina. #24-1, at 2. It is undisputed that, as a union worker, Plaintiff's terms and conditions of employment were governed by the CBA between Defendant and the International Brotherhood of Teamsters. Id., at 2-3.

It is also undisputed that in addition to the CBA, Defendant has in place a "Crisis Management and Workplace Violence Prevention Policy" which provides for "zero tolerance with respect to violence in the workplace." #24-2, at 9. Such policy defines unacceptable conduct as including "physical assaults, fighting, threatening comments, intimidation, and the intentional destruction of any company property, employee property, or merchandise." Id.

It is equally undisputed that Plaintiff's employment record with Defendant reflected two incidents of workplace violence that predated 2008. #24-1, at 4. In 1998, Plaintiff lost his temper, reportedly over bidding for vacation days, and threw company equipment on the

ground, cursed at the feeder supervisor, and approached him as if he were about to punch him. Id.; #24-2, at 16. In August of 2001, Plaintiff again lost his temper while driving a truck accompanied by a different feeder supervisor. #24-1, at 4; #24-2, at 18. Plaintiff exited the truck with a metal wheel pull bar in his hand, and he was "yelling at [the supervisor] to get out of the truck," and additionally threatened another manager and his family during the same incident. #24-1, at 4; #24-2, at 5.

**First Termination**

In early April 2008, Starr Horn, who works for Defendant as a dispatch specialist and supervisor (but was not Plaintiff's supervisor) filed a police report and informed management that Plaintiff came to her home early in the morning and "tried to force his way in, ultimately breaking the latch on her wooden screen door in an effort to gain entry." #24-1, at 3. Ms. Horn told Plaintiff to leave the property and threatened to call the police, and Plaintiff said "I'll kill you." Id.

It is undisputed that Defendant perceived Ms. Horn's claims as credible, id., even though Ms. Horn ultimately dropped her criminal complaint. #24-5, at 21. Plaintiff denied that the event occurred and noted that no other witnesses were present. #28, at 1. He also noted that he was on medical leave at the time, having been in a non-work-related car accident in March 2008 and was unable to return to work until May of 2008. #24-1, at 4.

Upon Plaintiff's return from medical leave on May 27, 2008, several of Defendant's managers met with Plaintiff to review Ms. Horn's allegations. #24-1, at 4-5; #24-3, at 3. Defendant gave Plaintiff an opportunity to address the allegations and Plaintiff reported for the first time that Ms. Horn had previously told another female co-worker to "get her old, tired ass into work." #28, at 1-2; #24-6, at 7. While Plaintiff contends that notifying Defendant of such comment motivated his termination on or about June 9, 2008, (#24-1, at

5), Defendant asserts that "the decision to discharge Plaintiff had already been made" prior to Plaintiff's return to work and prior to Plaintiff's report of the alleged age-biased comment made by the supervisor he had allegedly threatened. #24-1, at 5.[1] In support of such assertion, Defendant has presented evidence in the form of a declaration made by a decisionmaker, John Vinkler, as follows:

> Prior to David Sherman and Roger Millner's meeting with Mr. Vinesett on or about May 27, 2008, I conferred with Mr. Sherman and Mr. Millner regarding the appropriate disciplinary action to be taken with respect to Mr. Vinesett. The consensus determination reached by Mr. Sherman, Mr. Millner and myself during this time was that Mr. Vinesett should be discharged. In reaching this determination, consideration was given to Mr. Vinesett's history of threatening behavior in the workplace, including the December 1998 incident involving Andy Burnett and the August 2001 incident involving Alan McIntosh and Mr. Millner.

Declaration of John Vinkler (#24-3, at ¶7).

Upon his return from medical leave on May 27, 2008, Plaintiff's 2007 Department of Transportation certification was also reviewed. See Declaration of Roger Millner (#24-2, at ¶ 9). In comparing Plaintiff's 2007 answers with medical information from 2008 stemming from his car accident, management determined that Plaintiff had not previously provided accurate information regarding his anti-depressant medication program. Id. It is undisputed

---

[1] As to the alleged discriminatory comment made by Ms. Horn to another employee and overheard by Plaintiff, Roger Millner testified that he followed up on such accusation, as follows:

> My recall to the outcome is we didn't feel like there was - - Ms. Horne and the employee that supposedly the comment was made to worked in close proximity . . . .
>
> \* \* \*
>
> five, sometimes more, hours a night. They always had a good relationship. The other employee - - I don't recall her saying she felt like it was age discrimination or anything like that. And I don't recall anything that would have warranted it going any further.

Deposition of Roger Millner (#24-5, at 23).

that management concluded that the discrepancy contrasted with the "Honesty in Employment" form which defendant contends is executed by every UPS employee, and which provides that "dishonesty will result in immediate dismissal and possible criminal prosecution." Id., at 11.

Following termination on June 9, 2008, a discharge grievance was filed on Plaintiff's behalf by a union representative. Vinkler Decl. at ¶ 8. A local-level hearing was conducted, and the panel of three employer representatives and three local Union representatives deadlocked. Id. In October of 2008, an arbitrator ruled in favor of Plaintiff and ordered that Plaintiff be reinstated to his former position, but with a 60-calendar day unpaid suspension. Id. Plaintiff returned to work in December, 2008. Id.

**Second Termination**

Prior to his return to work in December, 2008, Plaintiff filed a charge of discrimination with the EEOC on or about November 11, 2008, claiming that he was suspended and fired for "trumped up reasons." Vinesett Deposition, Ex. 10 "Charge of Discrimination" (#24-6, at 23). In his administrative charge, Plaintiff alleges that despite the arbitrator's award, Defendant "refused to reinstate [him] in retaliation for [his] report of age biased comments." Id.

On or about November 21, 2008, in an attempt to mitigate any delay to Plaintiff's return to work, Defendant offered to return Plaintiff to work in the Feeder Division in the Charlotte hub at the same rate of pay as his feeder driver duties, but in a position that would not require him to be DOT certified. Vinkler Depo. at ¶ 12. Plaintiff contends this was a demotion from his previous position driving tractor trailers. Plaintiff's Response (#28, at 7). Ultimately, Plaintiff was re-certified and he returned to his feeder driver position in December 2008. Vinkler Decl. at ¶ 12.

On December 28, 2008, a feeder supervisor informed Plaintiff that a "safety ride" was necessary, which all feeder drivers company-wide had to complete at least once a year with a supervisor. Deposition of Roger Millner (#24-5, at 25). The supervisor assigned to conduct the safety ride was not Plaintiff's normal supervisor. Plaintiff's Response (#28, at 3). It is undisputed that supervisors could stand in for one another and such happened frequently. Millner Depo. at 9. The supervisor, Leroy Holland, reported to management that during the post-ride review, Plaintiff "became loud and belligerent, stood up from his chair and stepped toward [the supervisor], raising his fists as if he was preparing to punch [him]." Sherman Decl. ¶ 6. He added that Plaintiff was "very angry, belligerent, hostile and insubordinate to the point that I was fearful of my personal safety." Millner Decl., Ex. 5 (#24-2, at 27). Several co-workers submitted written summaries attesting to Plaintiff's raised voice and hostility during the safety review process. Id., at 25, 26.

After this incident, Defendant conducted an investigation of Mr. Holland's allegations and determined his allegations were credible. The three decisionmakers for UPS– John Vinkler, Roger Millner, and David Sherman – determined that Plaintiff should be discharged based upon the most recent incident and "his history with respect to workplace violence." Millner Decl. at ¶ 13. On December 29, 2008, Plaintiff was provided an opportunity to address Mr. Holland's allegations, and he provided a contrasting account. Plaintiff's Response at 3. Mr. Millner then informed Plaintiff that his employment was terminated for five reasons: insubordination to a UPS supervisor, overall unacceptable work record, threatening a UPS supervisor by acting in a hostile and aggressive manner, violation of the UPS work place violence policy, and theft of UPS property.[2] Millner Decl. Ex. 6 (#24-2, at

---

[2] The theft charge was resolved when Plaintiff returned his UPS identity card immediately following the termination. Id.

31). Defendant confirmed the termination and the reasons in a letter dated January 5, 2009. Millner Depo., Ex 4. Upon review of Plaintiff's second discharge grievance, a union panel upheld the termination. Id., at 36.

Plaintiff admitted during his deposition that he could not recall having told any one of the decisionmakers that he had filed an EEOC complaint in November 2008 prior to being terminated for the second time. See Vinesett Depo. at 158-160. Further, review of the unrebutted declarations of all three decisionmakers – John Vinkler, Roger Millner, and David Sherman – indicate that they were all unaware of Plaintiff's administrative charge at the time they decided to terminate Plaintiff's employment based on the allegations leveled by Mr. Holland.

### III. Summary Judgment Standard

Defendant has moved for summary judgment. Rule 56(a), Federal Rules of Civil Procedure, provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a). The rule goes on to provide procedures for responding to a Motion for Summary Judgment:

> **(c) Procedures.**
> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

> produce admissible evidence to support the fact.
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
> **(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c).

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id., at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit

factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

## IV. Standard of Review of a Claim of Retaliation

An ADEA retaliation claim undergoes the same protected activity analysis as a Title VII anti-retaliation provision. Speck v. City of Memphis, 594 F.Supp.2d 905, 923 (W.D.Tenn. 2009). Thus, to succeed on his claims, Plaintiff must now present evidence of a *prima facie* case of retaliation. See Causey v. Balog, 162 F.3d 795, 800 (4th Cir. 1998), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

In order for Plaintiff to establish a prima facie case for retaliatory discharge, he must show three elements: that he engaged in protected activity; that Defendant took adverse action against him; and that a causal connection exists between the protected activity and the adverse action. Causey, 162 F.3d at 803. If a prima facie case is met, Defendant may present evidence of legitimate, non-retaliatory reasons for the adverse action in rebuttal. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). If met, Plaintiff then must

show that the "proffered reasons are pretextual" by a preponderance of the evidence. Id.

V. Discussion

A. Establishing a Prima Facie Case

Plaintiff contends that he was discharged in retaliation for reporting a supervisor's remarks about a co-worker's age, and again for reporting his claim to the EEOC. He concedes that there is no direct evidence of retaliation, (#28, at 5; #31, at 4), and therefore must meet the elements of a prima facie claim. "The test for proving *prima facie* retaliatory discharge requires that (1) plaintiff engaged in protected activity, such as filing an EEO[C] complaint; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action." Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). Applying the standards, Plaintiff fails to set forth evidence to establish a prima facie case of retaliation. Each element of a prima facie case will be discussed *seriatim*.

1. Protected Activity

With regard to the first element, Plaintiff alleges two separate acts of protected activity: first, his May 2008 report of Ms. Horn's comment about a co-worker to management; and second, his November 2008 EEOC charge.

Protected activities can include acts of participation or opposition. Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) (participation in Title VII proceeding protected activity).

> An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace.

Id. "Participating" includes "(1) making a charge, (2) testifying, (3) assisting, or (4)

participating in any manner in an investigation, proceeding, or hearing under Title VII. Id. Opposition activities are also protected and include informal grievance procedures and "voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id. (internal citations omitted). The court finds that both activities are protected acts; thus, Plaintiff has satisfied the first element.

### 2. Adverse Action

The second element is also met: Defendant took adverse action against him by terminating his employment in June of 2008 and again in December of 2008. Termination is an adverse employment action. Id., at 258. Plaintiff has met the second element of a prima facie case.

### 3. Causal Connection

Plaintiff cannot show a causal connection between his claims of retaliation and his discharge. While close temporal proximity between an employer first learning of an employee's protected activities and its termination of his employment may be sufficient to set forth a prima facie case, King, 328 F.3d at 151 ("[w]hile this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality"), the key to establishing a causal connection based on temporal proximity lies with the timing of the decision of the adverse action, rather than the timing of the notification. Howell v. Bluefield Regional Medical Center, Inc., 2008 WL 2543448,*3 (S.D.W.Va. 2008).[3]

As to the protected activity of reporting the comment of Ms. Horn in May 2008, Plaintiff has failed to come forward with any evidence that disputes Defendant's evidentiary

---

[3] Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the Westlaw citation.

proffer that its decisionmakers intended to terminate Plaintiff's employment well-before he reported Ms. Horn's comment upon his return. Thus, there is no causal connection based on temporal proximity between the protected conduct and the adverse employment decision as Plaintiff has failed to present evidence that disputes Defendant's evidence that such decision was made before the protected activity occurred.

Equally, a causal connection has not been made between the EEOC charge and Plaintiff's second termination. Not only have each of the decisionmakers averred that they were unaware of the EEOC charges at the time they decided on discharge, Plaintiff even testified that he did not recall telling any decisionmaker that he had filed a charge of discrimination. Thus, a causal connection cannot be found based on temporal proximity. To the extent Plaintiff has attempted to link the December 2008 discharge to the May 2008 report concerning Ms. Horn, the seven-month period between those two events does not satisfy the requirements of close temporal proximity. As discussed by another court,

> when a plaintiff seeks to establish a causal link based on temporal proximity alone, the time period between the employer's knowledge and the adverse action must be "very close." *See, e.g., Clark Cnty. Sch.Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). The Fourth Circuit has indicated that a three-to-four month time lapse is too long to establish such a connection if the plaintiff is relying solely on temporal proximity.

Robinson v. Potter, 2010WL 4964741, at *3 (D.S.C. Nov. 9, 2010) (citing Pascual v. Lowe's Home Centers, Inc., 193 F. App'x. 229 (4th Cir. 2006) (unpublished)).

It appearing that Plaintiff has offered no other evidence to establish a causal connection between the protected activities and the adverse employment actions, Plaintiff has failed to establish a prima facie case and summary judgment will be entered in favor of defendant.

B.  **Legitimate, Non-Discriminatory Reason for Discharge**

Even though it is clear that Plaintiff cannot establish a prima facie case, Defendant has also satisfied its burden of coming forward with a legitimate, non-discriminatory reason for terminating Plaintiff's employment, to wit, a perception on the part of the decisionmakers at UPS that defendant had engaged in workplace violence. Thus, a rebutable presumption arises that Plaintiff was discharged on both occasions for a legitimate, non discriminatory reason.

C.  **Pretext**

To rebut the presumption, Plaintiff must demonstrate that "as between [the discriminatory reason] and the defendant's explanation, [the discriminatory reason] was the more likely reason for the dismissal, or that employer's proffered explanation is simply unworthy of credence." Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996). In attempting to satisfy this burden, Plaintiff has offered only his own speculation that retaliation was the real motivation of the decisionmakers, not their perceptions of his conduct. See Plaintiff's Response at 8-9. While a plaintiff may present circumstantial evidence to support his claim of retaliation, unsupported speculation is insufficient to show pretext or defeat a motion for summary judgment. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996); Felty v. Graves- Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Plaintiff's speculation and conjecture raises only a mere possibility of retaliation rather than the reasonable probability which is necessary to support an inference of unlawful motivation. Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-42 (4th Cir. 1982). Speculative assertions that a defendant's real motivation was unlawful is not enough to withstand summary judgment, Goldberg v. B. Green and Co., 836 F.2d 845, 848 (4th Cir. 1988), and conclusory statements will not satisfy a plaintiff's burden in responding to the motion for

summary judgment. Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211 (4th Cir. 1987). Finally, unsupported allegations "do not confer talismanic immunity from Rule 56." Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

Plaintiff's own speculation as to the decisionmakers' motivation finds no support anywhere in the admissible record. Having not presented evidence of pretext, Defendant is also entitled to summary judgment as its legitimate, non-discriminatory reason for Plaintiff's termination has not been rebutted.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (#24) is **GRANTED** for the reasons discussed above, summary judgment is **GRANTED** in favor of Defendant and against Plaintiff providing that Plaintiff have and take nothing from this Defendant, and this action is **DISMISSED** in its entirety with prejudice.

The Clerk of Court is respectfully instructed to enter a Judgment consistent with this Memorandum of Decision.

Signed: June 18, 2012

Max O. Cogburn Jr.
United States District Judge